# IN THE SUPREME COURT OF TEXAS

No. 16-0851

IN RE NORTH CYPRESS MEDICAL CENTER
OPERATING CO., LTD., RELATOR

ON PETITION FOR WRIT OF MANDAMUS

**Argued November 9, 2017**

JUSTICE LEHRMANN delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE BOYD, JUSTICE DEVINE, JUSTICE BROWN, and JUSTICE BLACKLOCK joined.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE GUZMAN joined.

Our procedural rules allow broad discovery of unprivileged information that is "relevant to the subject matter of the pending action." TEX. R. CIV. P. 192.3(a). This includes information that may ultimately be inadmissible at trial so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The "subject matter" of the underlying action, which involves the enforceability of a hospital lien securing payment of charges for services rendered to an uninsured patient, encompasses the reasonableness of those charges.

The trial court's order at issue in this mandamus proceeding requires the defendant hospital to produce information regarding its reimbursement rates from private insurers and public payers for the services it provided to the plaintiff. The hospital argues those reimbursement rates are

irrelevant to whether its charges to the uninsured plaintiff were reasonable and that the trial court therefore abused its discretion in ordering production of that information. We disagree. The reimbursement rates sought, taken together, reflect the amounts the hospital is willing to accept from the vast majority of its patients as payment in full for such services. While not dispositive, such amounts are at least relevant to what constitutes a reasonable charge. Accordingly, we deny the hospital's petition for writ of mandamus.

## I. Background

Crystal Roberts was involved in an automobile accident on June 9, 2015, and was taken by ambulance to the emergency room at North Cypress Medical Center. North Cypress released Roberts approximately three hours later after performing a series of x-rays, CT scans, lab tests, and other emergency services. Because Roberts was uninsured, North Cypress billed her for the services at its full "chargemaster" prices, which totaled $11,037.35. North Cypress also filed a hospital lien in the amount of the cost of its services, minus payments and adjustments credited to Roberts' account. *See* TEX. PROP. CODE § 55.002(a) ("A hospital has a lien on a cause of action or claim of an individual who receives hospital services for injuries caused by an accident that is attributed to the negligence of another person.").

The liability insurer of the driver at fault offered to settle the case for $17,380, attributing $9,404 to medical expenses stemming from North Cypress's services. Roberts sought reduction of North Cypress's bill, and the parties negotiated but could not reach an agreement on the bill's amount.[1] Roberts sued, seeking a declaratory judgment that North Cypress's charges were

---

[1] Roberts initially requested that the bill be reduced to $3,500, which she characterized as "the reasonable and necessary charges . . . for the treatment received based on the geographic area and similarly sized facilities." North Cypress offered to reduce the bill to $8,278.31, and Roberts countered with $6,269.33. North Cypress declined.

unreasonable and its lien invalid to the extent it exceeds a reasonable and regular rate for services rendered.[2]   North Cypress counterclaimed on a sworn account for $8,278.31, the amount to which it had previously offered to reduce its bill.

Roberts served requests for production and interrogatories on North Cypress, including the following:

- Please produce all contracts regarding negotiated or reduced rates for the hospital services provided to Plaintiff in which Defendant is a party, including those with Aetna, First Care, United Healthcare, Blue Cross Blue Shield, Medicare, and Medicaid.

  . . . .

- Please produce the annual cost report you are required to provide to a Medicare Administrative Contractor Medicare [sic], as a Medicare certified institutional provider for 2011, 2012, 2013, 2014 and 2015.

  . . . .

- Please state the Medicare reimbursement rate for x-rays, CT scans, lab tests and emergency room services, as you performed on the Plaintiff on June 9, 2015.

- Please state the Medicaid reimbursement rate for x-rays, CT scans, lab tests and emergency room services, as you performed on the Plaintiff on June 9, 2015.

North Cypress objected to these discovery requests and moved for a protective order, asserting that they sought irrelevant information and were overly broad.  Roberts filed a corresponding motion to compel.  In an oral ruling on the record, the trial court ordered North Cypress to produce

---

[2] Roberts also asserted claims for fraudulent lien filing and for violations of the Texas Deceptive Trade Practices Act and the Texas Debt Collection Act.  She further claimed that the lien is invalid because she was never formally admitted to the hospital.  These claims are not relevant to the instant discovery dispute.

the requested information, though the court narrowed the scope to include only contracts "that cover the [time] period at issue in this case."

North Cypress moved for reconsideration, reiterating its relevance objection and adding that it would "suffer irreparable harm" from the disclosure of its "confidential and proprietary" negotiated insurance contracts. The trial court denied the motion, prompting North Cypress to file a petition for writ of mandamus in the court of appeals. The court of appeals denied the petition, and North Cypress now seeks mandamus relief in this Court.

## II. Analysis

Mandamus is an extraordinary remedy granted only when the relator shows that the trial court abused its discretion and that no adequate appellate remedy exists. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004). "The trial court abuses its discretion by ordering discovery that exceeds that permitted by the rules of procedure." *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003). We address North Cypress's two challenges to the discovery order in turn.

### A. Relevance

North Cypress first argues that information about reimbursement rates from insurers and government payers is not relevant to Roberts' claims about the enforceability of its hospital lien. *See* TEX. R. CIV. P. 192.3(a) (parties may obtain discovery of information that is "relevant to the subject matter of the pending action"). Evidence is "relevant" if "it has any tendency to make a fact [of consequence to the action] more or less probable than it would be without the evidence." TEX. R. EVID. 401. And as noted, evidence need not be admissible to be discoverable so long as it "appears reasonably calculated to lead to the discovery of admissible evidence." TEX. R. CIV. P. 192.3(a).

4

Because the subject matter of this action involves a dispute over a hospital lien, in evaluating the relevance of the requested information we must begin with a discussion of Texas's hospital-lien statute, codified in Texas Property Code chapter 55. This statute provides hospitals an additional method of securing payment from accident victims, encouraging their prompt and adequate treatment. *McAllen Hosps., L.P. v. State Farm Cty. Mut. Ins. Co. of Tex.*, 433 S.W.3d 535, 537 (Tex. 2014). Subject to certain conditions, a hospital has a lien on the cause of action of a patient "who receives hospital services for injuries caused by an accident that is attributed to the negligence of another person." *Id.* (quoting TEX. PROP. CODE § 55.002(a)). The lien also attaches to the proceeds of a settlement of the patient's cause of action. TEX. PROP. CODE § 55.003(a)(3). We have noted that the statute "is replete with language that the hospital recover the full amount of its lien, subject only to the right to question the reasonableness of the charges comprising the lien." *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 309 (Tex. 1985); *see also Daughters of Charity Health Servs. v. Linnstaedter*, 226 S.W.3d 409, 411 (Tex. 2007) (noting that the amount of a hospital lien may not exceed "a reasonable and regular rate").[3]

North Cypress challenges the trial court's order requiring production of (1) its contracts with private insurers regarding the negotiated reimbursement rates it accepts from those insurers for the services provided to Roberts, (2) the reimbursement rates for those services from Medicare

---

[3] Notwithstanding these statements in *Bashara* and *Linnstaedter*, amici curiae Christus Health and Texas Health Resources argue that the hospital's charges for services rendered, as distinguished from physician charges and "charges for other services," need not be "reasonable" to be covered by a valid hospital lien. *Compare* TEX. PROP. CODE § 55.004(b) ("A hospital lien . . . is for the amount of the hospital's charges for services provided . . . ."), *with id.* § 55.004(c) ("A hospital lien . . . may also include the amount of a physician's reasonable and necessary charges for emergency hospital care services provided . . . ."), *and id.* § 55.004(d) ("A hospital lien . . . does not cover . . . charges for other services that exceed a reasonable and regular rate for the services[.]"). North Cypress does not make this argument and has consistently taken the position that its charges are reasonable. Accordingly, we do not address the statutory-interpretation argument amici present.

5

and Medicaid, and (3) North Cypress's annual Medicare cost reports for certain years. North Cypress primarily argues that its negotiated reimbursement rates with health insurance carriers are not relevant to its charges to an uninsured patient and therefore are not discoverable. It urges that because Roberts had neither private health insurance nor Medicare or Medicaid coverage when she was treated, she is not entitled to the benefit of those negotiated rates. North Cypress also cites our holding in *Haygood v. De Escabedo* that any billing adjustment reflected in the negotiated rates belongs to the insurance carrier, not the patient. 356 S.W.3d 390, 394–95 (Tex. 2012). According to North Cypress, this further highlights the distinction between billed charges and reimbursement rates.[4]

Roberts responds that the insurance contracts are necessary to establish whether the amount North Cypress charged Roberts for emergency services is excessive in comparison to the rates for the same services provided to other patients in the same hospital. Roberts avers that the contracts will show that North Cypress is customarily and regularly paid significantly less for those services, making the contracts relevant to the reasonableness of the charges.[5]

## 1. Healthcare Pricing

This case highlights the "two-tiered" healthcare billing structure that has evolved over the past several decades. In *Haygood*, on which North Cypress heavily relies, we described these tiers as encompassing (1) "'list' or 'full' rates [also described as chargemaster rates] sometimes charged to uninsured patients, but frequently uncollected," and (2) "reimbursement rates for patients

---

[4] Amici curiae Parkland Health & Hospital System, Hunt Regional Medical Center, Christus Health, Texas Health Resources, and Memorial Hermann Health System submitted briefs in support of North Cypress's petition.

[5] Amici curiae The Alliance of Claims Assistance Professionals, The Fuentes Firm, P.C., and Research & Planning Consultants, LP, submitted briefs in support of Roberts.

6

covered by government and private insurance." *Id.* at 393 (footnotes omitted). We noted that "[f]ew patients today ever pay a hospital's full charges," *id.* (alteration in original) (citing *Linnstaedter*, 226 S.W.3d at 410), but that hospitals are pressured to set these charges as high as possible because reimbursement rates typically increase along with them, *id.*

Commentators lament the increasingly arbitrary nature of chargemaster prices, noting that, over time, they have "lost any direct connection to costs or to the amount the hospital actually expect[s] to receive in exchange for its goods and services." George A. Nation III, *Hospital Chargemaster Insanity: Heeling the Healers*, 43 PEPP. L. REV. 745, 755 (2016) (citing Christopher P. Tompkins et al., *The Precarious Pricing System for Hospital Services*, 25 HEALTH AFF. 45, 48 (2006)). Yet hospitals have incentive to continue raising chargemaster prices because of the positive correlation between those prices and hospital revenue. *Id.* at 755–56; *see also* George A. Nation III, *Determining the Fair and Reasonable Value of Medical Services: The Affordable Care Act, Government Insurers, Private Insurers and Uninsured Patients*, 65 BAYLOR L. REV. 425, 454 (2013) ("In one form or another, a hospital's billed (chargemaster) charges are used indirectly to determine the ultimate dollar level of reimbursement payments.").[6] This trend continues notwithstanding the fact that hospitals generally expect to recover far less than they officially "charge." *E.g.*, Tompkins, 25 HEALTH AFF. at 48 ("The gap between charges and actual payments (net patient revenues) now averages about 255 percent and is growing rapidly.").

---

[6] The author of these two law review articles, George A. Nation III, is counsel of record for amicus curiae The Alliance of Claims Assistance Professionals.

## 2. Evaluating Reasonableness of Hospital Charges

Citing *Haygood*, North Cypress notes that its legal right to be paid for Roberts' treatment is not offset by a negotiated agreement with an insurance carrier. *See Haygood*, 356 S.W.3d at 391 (holding that a plaintiff's recovery of medical expenses incurred is limited, as is the evidence at trial, "to expenses that the provider has a legal right to be paid"). The dissent similarly opines that hospitals should not be limited "to charging an uninsured patient insurer-negotiated reimbursement rates." *Post* at ___. According to North Cypress and the dissent, this renders irrelevant any adjustments that would have been applicable if Roberts were covered by private health insurance, Medicare, or Medicaid.

However, the issue is not whether Roberts may take advantage of insurance she did not have. Rather, because a valid hospital lien may not secure charges that exceed a reasonable and regular rate, the central issue in a case challenging such a lien is what a reasonable and regular rate would be.[7] And because of the way chargemaster pricing has evolved, the charges themselves are not dispositive of what is reasonable, irrespective of whether the patient being charged has insurance.[8] By contrast, a hospital's reimbursements from private insurers and public payers comprise the vast majority of its payments for services rendered. We fail to see how the amounts

---

[7] North Cypress accuses Roberts of utilizing the full amount of the billed charges to negotiate a favorable settlement with the liability insurer and then seeking a windfall by challenging those charges as unreasonable. To the extent North Cypress asserts some sort of estoppel defense in the underlying suit, we fail to see how it forecloses discovery on a central issue.

[8] North Cypress contends that it "charges all patients the same thing for any particular service, regardless of whether the patient has health insurance." This argument reflects the fact that chargemaster prices are technically listed on all patient bills, but ignores the fact that, for insured patients, the amount actually accepted as payment after applying the negotiated discount is typically far lower. *Haygood*, 356 S.W.3d at 391 (noting the "great disparities between amounts billed and payments accepted" from insurers).

a hospital accepts as payment from most of its patients are wholly irrelevant to the reasonableness of its charges to other patients for the same services.

Courts in several other jurisdictions agree. In *Bowden v. Medical Center*, 773 S.E.2d 692 (Ga. 2015), the Supreme Court of Georgia recently considered the exact issue presented here. That case also involved the validity and amount of a hospital lien for the reasonable charges for an uninsured's patient's care. *Id.* at 693. The patient, Bowden, sought information and documents regarding amounts the hospital charged insured patients for the same type of care during the same time period. *Id.* The court held that such documents were discoverable, concluding:

> The amounts that TMC charged to (*and agreed to accept as payment in full from*) other patients treated at the same hospital for the same type of care during the same general time frame that Bowden was treated may not be dispositive of whether TMC's charges for Bowden's care were "reasonable" under [Georgia's hospital lien statute], to the extent that the other patients were not similarly situated in other economically meaningful ways. But that does not mean that how much TMC charged those other patients is entirely irrelevant—particularly in the broad discovery sense—to the reasonableness of the charges for Bowden's care.

*Id.* at 696–97 (emphasis added). The court clarified that the hospital would be entitled to present evidence that the different amounts paid by insured patients "reasonably reflected such economic factors as volume discounts or promises of prompt and full payment, or [were] based on the rates that the government was willing to pay." *Id.* at 697. The court also noted that the evidence may or may not ultimately be admissible at trial, confirming that its holding was merely that the discovery sought had "some relevance to the reasonableness of [the hospital's] charges for [Bowden's] care." *Id.*

Other courts have held similarly. In *Parkview Hospital, Inc. v. Frost*, which involved the determination of reasonable charges to an uninsured patient under the Indiana Hospital Lien Act, the Indiana Court of Appeals held that the patient was entitled to discover information about

9

discounted amounts the hospital accepted from patients who had private insurance or were covered by government programs. 52 N.E.3d 804, 805–06, 810 (Ind. Ct. App. 2015).[9]

Appellate courts have also addressed the issue in the context of determining the reasonable value of hospital services provided to patients whose insurers had no contractual relationship with the hospital at the time of emergency treatment. For example, in *Children's Hospital Central California v. Blue Cross of California*, the noncontracting insurer was required by statute to pay the hospital "the reasonable and customary value" of its services, which "embodies the concept of quantum meruit." 172 Cal. Rptr. 3d 861, 872 (Ct. App. 2014). During discovery, the insurer sought admission from the hospital that all its contracts provided for payment of less than the full billed charges, as well as information regarding the number of patients for whom the hospital had received its full billed charges as payment for similar services. *Id.* at 867. The court noted that, in quantum meruit cases, "a wide variety of evidence" is accepted in determining reasonable value of services, which the court equated with fair market value. *Id.* at 872. While the hospital's full billed charges were relevant to that value, so was "the full range of fees that Hospital both charges and accepts as payment for similar services. The scope of the rates accepted by or paid to Hospital by other payors indicates the value of the services in the marketplace." *Id.* at 873; *see also Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc.*, 832 A.2d 501, 508 (Pa. Super. Ct. 2003) (holding that the amounts the hospital actually received for its services were relevant to the reasonable value

---

[9] Not all courts agree on the relevance of such information. In *Parnell v. Madonna Rehabilitation Hospital, Inc.*, for example, the Nebraska Supreme Court upheld summary judgment for the hospital on the amount of its hospital lien. 602 N.W.2d 461, 464–65 (Neb. 1999). Noting that the statute at issue provided for a lien on the amount due for the hospital's "usual and customary charges," the court summarily held that consideration of the "amounts actually collected," rather than the amount charged, would contravene the statute's plain language. *Id.* at 464. Importantly, however, the statute at issue in *Parnell* did not contain a reasonableness requirement. And while the court correctly noted the unremarkable proposition that amounts charged and amounts collected are two different things, it failed to explain why they are wholly unrelated.

10

of those services, particularly in light of the fact that the hospital "rarely recovers its published rates").

Finally, the United States District Court for the Southern District of Florida provided helpful analysis in a case involving a motion to dismiss a putative class action complaint challenging the reasonableness of a hospital's charges to uninsured patients. *Colomar v. Mercy Hosp., Inc.*, 461 F. Supp. 2d 1265, 1267–68 (S.D. Fla. 2006). The hospital urged that an unreasonable-pricing claim required allegations—which the plaintiff did not make—that the hospital's chargemaster prices "grossly exceed" those of other hospitals in the same market. *Id.* at 1269. The district court rejected that argument, in part because the plaintiff in fact made such allegations and in part because "a market analysis is not the sole measure of evaluating reasonableness." *Id.* at 1270. Another "piece of relevant information in the inquiry," the court held, is "the prices charged to other patients [in the same hospital], and the amounts received from them, [which] may offer some insight into the value of the actual services provided." *Id.* at 1271–72. The court concluded that the plaintiff's allegation that patients with private insurance and government benefits received significant discounts for the hospital's services "suggests that the value of the services charged to Plaintiff may be significantly less than" she was asked to pay, and "if borne out during discovery, would be evidence in support of the conclusion that the charges imposed on Plaintiff [were] unreasonable." *Id.* at 1272. Finally, the court recognized that the hospital's internal cost structure could also play a role in the analysis. *Id.*

These cases demonstrate at least the potential connection between reimbursement rates and the reasonableness of billed charges. *See* TEX. R. EVID. 401 (evidence is relevant if "it has any tendency to make a fact [of consequence to the action] more or less probable than it would be

11

without the evidence"). Roberts does not argue, and we do not conclude, that reimbursement rates standing alone are dispositive of the question of what constitutes a reasonable and regular rate for a hospital's services.[10] And we recognize that many considerations go into negotiated rates that may explain a discount applied to a particular insurer. *See, e.g.*, *Bowden*, 773 S.E.2d at 697 (noting such factors as volume discounts and promises of prompt and full payment). We further recognize that government-payer reimbursement rates are not necessarily a perfect comparator in evaluating the reasonableness of a provider's charges. *See* Nation, 65 BAYLOR L. REV. at 459. But the fact that explanations exist for disparate reimbursement rates does not render them wholly immaterial. As noted, considered together, reimbursements from insurers and government payers comprise the bulk of a hospital's income for services rendered. It defies logic to conclude that those payments have nothing to do with the reasonableness of charges to the small number of patients who pay directly. *See id.* at 461 (suggesting that a good starting point for measuring the fair and reasonable value of medical services is the average of the negotiated private-insurer reimbursement amounts, with adjustments to reflect the value such insurers provide).[11]

The dissent complains that this conclusion contradicts our holding in *In re National Lloyds Insurance Co.* that one party's attorney's fees in a case are generally irrelevant to the reasonableness of the opposing party's fees. 532 S.W.3d 794, 810–12 (Tex. 2017). We summarized our reasoning for that holding as follows:

---

[10] We express no opinion on the reasonableness of the charges secured by North Cypress's hospital lien in this case, as the merits of Roberts' claims are not before us. The issue presented is limited to whether certain information is discoverable.

[11] The dissent concludes that "a reasonable charge to Roberts would be what North Cypress, and perhaps other similarly situated hospitals, regularly charge uninsured patients." *Post* at ___. But as we have recognized, in most cases hospitals simply do not expect to collect anywhere close to the amounts they officially charge. *Haygood*, 356 S.W.3d at 393; Tompkins, 25 HEALTH AFF. at 48. We disagree that rates a hospital does not expect to collect are more relevant than amounts they accept.

12

(1) the opposing party may freely choose to spend more or less time or money than would be "reasonable" in comparison to the requesting party; (2) comparisons between the hourly rates and fee expenditures of opposing parties are inapt, as differing motivations of plaintiffs and defendants impact the time and labor spent, hourly rate charged, and skill required; (3) "the tasks and roles of counsel on opposite sides of a case vary fundamentally," so even in the same case, the legal services rendered to opposing parties are not fairly characterized as "similar"; and (4) a single law firm's fees and hourly rates do not determine the "customary" range of fees in a given locality for similar services.

*Id.* at 808 (footnote omitted). The "fundamental" variations affecting the connection between the information sought and the end for which it was sought in *National Lloyds* are not present here. Roberts seeks reimbursement rates only for the specific services she received.[12] Further, Roberts does not argue, and we do not hold, that the rates negotiated between North Cypress and any particular insurer govern the reasonableness of its charges to uninsured patients. Rather, we hold that the trial court did not abuse its discretion in concluding that the amounts North Cypress is willing to accept as payment for services rendered to the vast majority of its patients is relevant to the reasonableness of its charges for those same services to uninsured patients. *See Haygood*, 356 S.W.3d at 393 (noting that few patients pay a hospital's full charges).

Finally, we note that North Cypress does not elaborate in its briefing on its relevance objection to the information contained in its Medicare cost reports. In any event, for discovery purposes a hospital's costs surely have some bearing on the reasonableness of its patient charges. *See Colomar*, 461 F. Supp. 2d at 1272 (noting that a hospital's internal cost structure could play a

---

[12] By contrast, in *In re National Lloyds Insurance Co.*, we held that an insured homeowner suing her insurer for underpayment of her property-damage claim was not entitled to discovery of her insurer's claim files relating to other homeowners who suffered property damage during the same storm. 449 S.W.3d 486, 490 (Tex. 2014). Given the individual nature of the condition of the properties and the damage inflicted, we held that the insurer's "overpayment, underpayment, or proper payment of the claims of unrelated third parties" was not relevant to whether the insurer properly compensated the plaintiff. *Id.* at 489. In this case, Roberts is asking for the amounts North Cypress accepts as payment on behalf of other patients for the exact same services.

13

role in evaluating a claim of unreasonable pricing).  Accordingly, we hold that the trial court did not order the production of irrelevant information.[13]

## B. Confidentiality

In addition to its relevance objection, North Cypress argues the confidential nature of its insurance contracts warrants mandamus relief from the trial court's order requiring their production.  North Cypress first raised this argument in its motion for rehearing in the trial court.  During the hearing at which the trial court denied the motion, North Cypress sought clarification on whether the court would "be willing to put in place" measures to protect its confidentiality concerns "if ultimately our mandamus is unsuccessful."  The court replied that, if the parties were unable to agree on such measures, North Cypress could "file a motion for a confidentiality order" for the court's consideration.

Nothing in the record indicates that the trial court is unwilling to issue a protective order in the event North Cypress requests and demonstrates its entitlement to one.  *See* TEX. R. CIV. P. 192.6.  Nor does North Cypress explain why, in the event it is entitled to a protective order, such relief would be insufficient to address its concerns.  Accordingly, we decline to grant mandamus relief on the ground that the contracts contain confidential and proprietary information.

## III. Conclusion

The crux of Roberts' lien claim is whether the amount secured by North Cypress's hospital lien exceeds a reasonable and regular rate for the services provided.  The amounts North Cypress

---

[13] With respect to private insurance contracts, Roberts requested North Cypress's "contracts regarding negotiated or reduced rates for the hospital services provided to Plaintiff."  We do not read this request to seek the contracts in their entirety.  Rather, Roberts requested, and the trial court ordered, production of those portions of the contracts that reflect the specific rate information identified.  Roberts does not contend that any other information contained in those contracts is relevant to her claims.

14

accepts as payment for those services from other patients, including those covered by private insurance and government benefits, are relevant to whether the charges to Roberts were reasonable and are thus discoverable. We hold that the trial court did not abuse its discretion in compelling production of this information. Accordingly, we deny North Cypress's petition for writ of mandamus.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** April 27, 2018